# SARAFA LAW LLC

Melinda Sarafa
msarafa@sarafalaw.com

80 Pine Street, Floor 33
New York, NY 10005
T: 212 785 7575
F: 212 785 7577
www.sarafalaw.com

January 23, 2009

**By ECF and Hand Delivery**

Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States v. Hector Melo*, No. 08-CR-709-02 (DLC)

Dear Judge Cote:

On behalf of my client, Hector Melo, I respectfully submit this letter, pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure, to aid this Court in determining a just and fair sentence in this case. Sentencing is scheduled for February 6, 2009. For a number of reasons, including Mr. Melo's unusually limited role in the offense, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ his personal background, family circumstances and certain deportation as a result of his conviction, and the unduly harsh Sentencing Guidelines for crack cocaine offenses, I respectfully submit that a non-Guidelines sentence below the applicable Guidelines range of 46 to 57 months is appropriate in this case.

## Case Background

Hector Melo pleaded guilty on October 21, 2008 to one count of conspiracy to distribute and possess with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. The charged conspiracy relates to a single crack cocaine transaction that took place on June 23, 2008. The extent of Mr. Melo's role in that transaction was to introduce his co-defendant, Martin Nunez, to someone who could supply approximately 100 grams of crack. Mr. Melo is an admitted former user of cocaine, but has no history of selling or otherwise distributing the drug. His involvement in this case came about when Mr. Nunez, his wife's cousin, asked him if he knew someone who could sell him about 100 grams of crack. Mr. Melo agreed to call someone. On the day of the offense, Mr. Melo called the individual he knew, who said he could get the crack. Mr. Nunez and a confidential informant arrived later that day in front of Mr. Melo's house, and the seller arrived soon thereafter. When the seller tried to provide the

SARAFA LAW LLC

Honorable Denise L. Cote
January 23, 2009
Page 2

crack to Mr. Melo, Mr. Melo indicated that it was not for him and directed him to give it to Mr. Nunez. Mr. Melo did not discuss or negotiate the sales price, nor did he receive any payment for making the introduction.

Mr. Melo was arrested on August 6, 2008. He made a timely decision to accept responsibility and plead guilty to the charged conspiracy. Approximately two months after his arrest, Mr. Melo participated in safety valve proffer and truthfully relayed to the Government his involvement in the offense. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

### Personal Background of Hector Melo

Hector Melo, a 39-year-old native of the Dominican Republic, lawfully came to the United States in 1993 in order to escape the poverty of his home country and pursue a better life. With a fourth-grade education and work experience in grocery stores, construction and agriculture, and as a money collector on buses in the Dominican Republic, Mr. Melo has worked in a variety of Brooklyn bodegas since his 1993 arrival in New York. At the time of his arrest, he was employed as a cashier at Novato Grocery in the Stuyvesant Heights section of Brooklyn, earning approximately $1,200 per month. *See* Ex. 1 (Letter from Edwin Perez, Owner, Novato Grocery).

Approximately nine years ago, Mr. Melo entered into a serious relationship with his current wife, Carmen Batista. At the time, Ms. Batista had three young children between the ages of about six and 11. Mr. Melo helped raised the children, Joel Bernoa (now age 20), Madelyn Almonte (now age 18) and Giderlyn Garcia (now age 16), as if they were his own, and they consider him their father. He has especially close relationships with Madelyn and Giderlyn. Madelyn, who has a one and one-half-year-old son and is expecting her second child in August, has taken her father's incarceration particularly hard. She is now experiencing significant prenatal depression and is concerned that the stress may affect her unborn child. *See* Ex. 2 (Letter from Yaffa Goldstein, L.M.S.W.). Giderlyn likewise is finding himself extremely depressed, with "an empty space in my heart no one can replace." Ex. 3 (Letter of Giderlyn Garcia).

Mr. Melo and Ms. Batista formally married in Brooklyn on June 26, 2007. Ms. Batista remains supportive of her husband, though his incarceration has been extremely trying both emotionally and financially for the family. Ms. Batista has worked for several years as a home attendant through Saint Nicholas Human Support Corp., earning approximately $1,200 per month. *See* Ex. 4 (Letter of Lucia Plaza, Personnel Supervisor, Saint Nicholas Human Support Corp.); PSR ¶ 56. She and her children, along with her sister and her sister's two children, relocated to a more affordable home after Mr. Melo's arrest because the financial burden became

SARAFA LAW LLC

Honorable Denise L. Cote
January 23, 2009
Page 3

too great without his income. *See* PSR ¶¶ 56-57. They all miss Mr. Melo tremendously; Ms. Batista's 7-year-old niece, Marleny Batista, writes that she misses her uncle "so, so, so much" and asks the Court to send him home so she can "give him a big, big, big, big, big hug." *See* Ex. 5 (Letter of Marleny Batista).

Ms. Batista and her children are all United States citizens. They are well-settled in this country, with gainful employment, a home and extended family close by. They had certainly planned to continue their lives in New York, as had Mr. Melo. Indeed, having planned to live permanently in the United States, Mr. Melo and Ms. Batista had filed an application in August 2007 to adjust Mr. Melo's immigration status to that of permanent resident. *See* Ex. 6. This application was pending at the time of his arrest.

In addition to his wife, children, and his wife's extended family, Mr. Melo is joined in Brooklyn by his older brother, Eligio Lima-Melo, also a United States citizen, and Eligio's children. Eligio's three daughters, Aranza Melo, age 12, Vanessa Melo, age 10, and Whitney Melo, age 7, are very close to their Uncle Hector, their only uncle who resides in the United States and with whom they shared a home in their younger years. Each of them describes Uncle Hector as a loving and fun family member who has been deeply missed during his time in custody. *See* Exs. 7, 8 & 9 (Letters of Aranza Melo, Vanessa Melo & Whitney Melo).[1]

Mr. Melo's 7-year-old god daughter, Isamar Sosa, views Mr. Melo as "almost like a father," since her own father lives in the Dominican Republic. Ex. 10 (Letter of Isamar Sosa). Like Mr. Melo's children and nieces, Isamar misses Mr. Melo terribly and begs the Court to let him out soon. *Id.*

Mr. Melo not only has extremely strong family relationships in New York, but also has developed strong ties within his Brooklyn community. The pastor of Saint Barbara Church, where Mr. Melo has been an active parishioner for many years, writes that he has always found Mr. Melo "to be friendly, cooperative and bright . . . . He is a dedicated, hard-working, and industrious man as a member of this community." Ex. 11 (Letter of Father Fulgencio Gutierrez, Pastor, Saint Barbara Church). Joe Muniz, President of the Caribbean Consulting Group Inc. in Brooklyn, has become close friends with Mr. Melo during the 10 years they have known each other. Mr. Muniz writes that Mr. Melo "is a good person and gets along with others and would do a favor for anyone in need." Ex. 12 (Letter of Joe Muniz, President, Caribbean Consulting Group Inc.). Another longtime friend, Celibee Vecchio, who has known Mr. Melo for 15 years, describes him as "a good person for his family and for the community," who has integrity and is a respectful and loyal "family man." Ex. 13 (Letter of Celibee Vecchio).

---

[1] As documented in the PSR, Mr. Melo's parents continue to live in the Dominican Republic, as do his younger brother and two sisters. PSR ¶53.

SARAFA LAW LLC

Honorable Denise L. Cote
January 23, 2009
Page 4

## Applicable Sentencing Considerations

Pursuant to the United States Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and the Second Circuit's interpretation of *Booker* in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), this Court's sentencing decision must be based upon the factors set forth in 18 U.S.C. § 3553(a). Section 3553(a) requires the Court to impose a sentence "sufficient, but not greater than necessary" to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct, to protect the public, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a).

The factors the Court must consider in determining how to satisfy the enumerated goals of sentencing are the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range set forth in the U.S. Sentencing Guidelines, any policy statements issued by the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victims of the offense. *Id.* The Second Circuit recently reaffirmed these sentencing principles while emphasizing that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*). "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id.*

In this case, because Mr. Melo meets the "safety valve" criteria set forth in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, the 10-year mandatory minimum sentence normally applicable to violations of 21 U.S.C. § 841(b)(1)(A) does not apply here. In addition, while this Court must consider the Sentencing Guidelines in determining an appropriate sentence, this Court is no longer required to impose a sentence within the range specified by the Guidelines. *Crosby*, 397 F.3d at 111. In this case, the applicable Guidelines range is 46 to 57 months, based upon a total offense level of 23 and a Criminal History Category of I. See PSR ¶74.

## A Non-Guidelines Sentence is Appropriate in This Case

As noted, the Sentencing Guidelines are but one of several factors that this Court must consider in determining an appropriate sentence. Based upon the combination of factors discussed herein, I respectfully submit that a non-Guidelines sentence below the 46 to 57-month range would be sufficient to meet the goals of sentencing without, as cautioned against in § 3553(a), imposing a punishment "greater than necessary." *See* 18 U.S.C. § 3553(a).

SARAFA LAW LLC

Honorable Denise L. Cote
January 23, 2009
Page 5

### A. Mr. Melo Played an Unusually Limited Role in the Charged Drug Transaction and Has No History of Drug Trafficking

When Mr. Melo agreed to introduce a friend seeking to purchase a quantity of crack cocaine to an individual who might be able to supply it, he had no idea that it would implicate him in a federal crack cocaine conspiracy and cause him to face four to five years of imprisonment. Mr. Melo has no history of drug trafficking. He neither expected to receive nor actually received any payment for making the introduction in this case. He did not negotiate or discuss with either party the price for the sale. Rather, as a former user of cocaine who had contact with someone who sold the drug, Mr. Melo agreed as a favor to his friend to call the would-be supplier. There is no evidence to suggest that Mr. Melo intended to make other introductions for either party or participate in any subsequent transactions. Mr. Melo declined to even receive the crack from the seller on behalf of his friend, as he did not view himself as a party to the transaction.

Unfortunately for Mr. Melo, the law takes a different view of his involvement, and holds him accountable for the quantity of crack exchanged between the buyer and seller. From the standpoint of sentencing, however, the particular role he played in the offense, and the circumstances surrounding that role, are relevant to determining what period of incarceration is really necessary to meet the sentencing goals of punishment, specific and general deterrence, and protection of the public. Counsel respectfully submits that, under the particular circumstances here, a sentence in the range of four to five years is considerably longer than necessary to meet these goals. Mr. Melo is not an individual with a history of trafficking in any controlled substances, nor does the current offense suggest that he has any propensity to do so in the future. While some degree of punishment is warranted to account for the seriousness of the offense, several years of incarceration for an individual with a history of gainful employment and family responsibility, based upon a single instance of facilitating a drug sale in which he had no financial interest whatsoever, runs counter to the overall interests of society and tends to undermine the goals of sentencing rather than meet them.

### B. The Extraordinary Disparity Between the Crack Cocaine and Powder Cocaine Sentencing Guidelines Overstates the Seriousness of the Offense as to this Defendant

If Mr. Melo had been convicted of a drug conspiracy involving 99.1 grams of powder cocaine, rather than the 99.1 grams of crack cocaine involved in this case, he would be facing a Guidelines range of 4 to 10 months rather than 46 to 57 months.[2] This extraordinary disparity in

---

[2] Using the November 1, 2008 edition of the Guideline manual, this calculation is based on a base offense level of 16, U.S.S.G. § 2D1.1(c)(12), with the same adjustments applied to Mr. Melo in the calculation of his total adjusted offense level (safety valve (2 points), U.S.S.G.

SARAFA LAW LLC ─────────────────────────────

Honorable Denise L. Cote
January 23, 2009
Page 6

the treatment of powder cocaine and crack cocaine in the Sentencing Guidelines – a problem often referred to as the "100-to-1 drug quantity ratio" because it reflects the statutory scheme in which it takes 100 times more powder cocaine than crack cocaine to trigger the same mandatory minimum penalty – persists despite the November 1, 2007 amendment reducing the crack cocaine Guidelines.

This comparison is not intended as a literal argument that Mr. Melo should be sentenced to a term of imprisonment of 4 to 10 months, but to illuminate the tremendous ongoing disparity between the powder and crack cocaine Guidelines, which the United States Sentencing Commission (the "Commission") and many other respected bodies view as without meaningful justification and inimical to the goals of sentencing. *See* United States Sentencing Commission, *Report to the Congress: Cocaine and Federal Sentencing Policy* (May 2007), available at http://www.ussc.gov/r_congress/cocaine2007.pdf (hereinafter "2007 Report").[3] Based upon a thorough examination and consideration of its own research data, scientific and medical literature, written public comment and expert testimony at public hearings involving representatives of the Executive Branch, the Judiciary, the medical and scientific communities, state and local law enforcement, criminal justice practitioners, academics and community interest groups, as well as state cocaine sentencing policies, the Commission continues to find that:

(1)  The current quantity-based penalties overstate the relative harmfulness of crack cocaine compared to powder cocaine.

(2)  The current quantity-based penalties sweep too broadly and apply most often to lower level offenders.

(3)  The current quantity-based penalties overstate the seriousness of most crack cocaine offenses and fail to provide adequate proportionality.

(4)  The current severity of crack cocaine penalties mostly impacts minorities.

---

§ 2D1.1(b)(11); minor role (2 points), U.S.S.G. § 3B1.2(b); and acceptance of responsibility (3 points), U.S.S.G. § 3E1.1(b)).

[3] As the Commission put it, "[f]ederal cocaine sentencing policy, insofar as it provides substantially heightened penalties for crack cocaine offenses, continues to come under almost universal criticism from representatives of the Judiciary, criminal justice practitioners, academics, and community interest groups, and inaction in this area is of increasing concern to many, including the Commission." 2007 Report, at 2; *see also id.*, Appendix B (Summary of Public Hearings on Cocaine Sentencing Policy) & Appendix C (Summary of Written Public Comment on Cocaine Sentencing Policy).

2007 Report, at 7-8. Accordingly, in its 2007 Report, the Commission reiterated "its consistently held position that the 100-to-1 drug quantity ratio significantly undermines the various congressional objectives set forth in the Sentencing Reform Act." *Id.* at 8.

The Commission has strongly urged Congress to address the 100-to-1 drug quantity ratio by, among other things, increasing the statutory mandatory minimum threshold quantities for crack cocaine offenses to focus the penalties more closely on serious and major traffickers. *Id.* at 8. Without Congressional action, the Commission has been limited in its ability to adjust the Guidelines to bridge the unwarranted disparity between crack and powder cocaine sentencing ranges. In the Commission's view, the November 1, 2007 amendment reducing the crack cocaine Guidelines to some extent is no more than "*a partial remedy* to some of the problems associated with the 100-to-1 drug quantity ratio." *Id.* at 10 (emphasis added).

The U.S. Supreme Court recognized the problems articulated by the Commission, and the limits of the November 1, 2007 amendment, in *Kimbrough v. United States*, 128 S.Ct. 558, 569 (2007). *Kimbrough* forced the Court to squarely address the question of whether a sentencing judge may consider the disparity between the Guidelines' treatment of crack and powder cocaine offenses when determining whether a Guidelines sentence is "greater than necessary" to serve the goals of sentencing in a particular case. In holding that a sentencing judge may consider this disparity, the Court reaffirmed the need for a district court to consider the applicable Guideline range as a "'rough approximation of sentences that might achieve §3553(a)'s objectives,'" *id.* at 574 (quoting *Rita v. United States*, 127 S.Ct. 2456, 2465 (2007)), but emphasized that the sentencing judge has greater familiarity with the individual case and the individual defendant than the Commission, and therefore is in a better position to find facts and evaluate the §3553(a) factors in a particular case. *Kimbrough*, 128 S.Ct. at 574.

In the case of Hector Melo, a low-level player in a crack cocaine conspiracy involving a single transaction, the persistent disparity between the crack and powder cocaine Guidelines vastly overstates the seriousness of the offense and calls for a punishment must "greater than necessary" to serve the objectives set forth in § 3553(a). A non-Guidelines sentence that takes this disparity into account, as authorized by *Booker* and *Kimbrough*, is warranted under the circumstances presented here.



SARAFA LAW LLC

Honorable Denise L. Cote
January 23, 2009
Page 8

### D. Mr. Melo's Certain Deportation and Exclusion from the United States Create Family Hardships that Will be Exacerbated by a Lengthy Period of Incarceration

Because he is not a United States citizen, Mr. Melo faces certain deportation and permanent exclusion from the United States as a result of his conviction in this case. Under U.S. immigration law, a drug trafficking felony under the Controlled Substances Act, 21 U.S.C. §§ 801 et seq., which includes the offense in this case, is deemed an "aggravated felony" for immigration purposes. *See* 8 U.S.C. § 1101(a)(43)(B). An attempt or conspiracy to commit any offense defined as an "aggravated felony" is also an "aggravated felony." 8 U.S.C. § 1101(a)(43)(U). As an "aggravated felon," Mr. Melo will be conclusively presumed to be deportable, 8 U.S.C. § 1228(c), subject to mandatory detention, 8 U.S.C. § 1231(a)(2), subject to expedited removal proceedings, 8 U.S.C. § 1228(a)(3), precluded from judicial review of any final order of removal, 8 U.S.C. § 1252(a)(2)(C), ineligible for discretionary relief, 8 U.S.C. § 1229b(a)(3), and permanently barred from readmission to the United States, 8 U.S.C. § 1182(a)(9)(A)(i).

Mr. Melo's deportation and lifelong exclusion from the United States will be devastating both emotionally and financially for his family. His wife and her three children, who consider him their father, are all United States citizens with firmly established lives in Brooklyn. The same is true of Mr. Melo's brother, Eligio, whose children maintain close relationships with Mr. Melo. Mr. Melo's certain deportation and exclusion place all of these family members in the extraordinarily difficult position of having to chose between their settled lives in the United States without him, and relocating to the Dominican Republic to enjoy daily life with him.

While it could be argued that a longer period of incarceration in the United States ameliorates this stark choice, an examination of all relevant factors reveals that this is not so. First, Mr. Melo will not be able to control where he serves his time, which is a matter within the discretion of the Federal Bureau of Prisons and may turn out to be a great distance from New York. Second, even if Mr. Melo were within a reasonable visiting distance from Brooklyn, non-legal inmate visits are subject to numerous restrictions of time, space and degree of contact, all of which limit both the quantity and quality of interaction. Third, Mr. Melo is unable to contribute to his family's financial well-being while incarcerated. While his earning potential will be substantially diminished in the Dominican Republic as compared to New York, it will still be significantly greater than his earning potential in prison. Finally, the longer Mr. Melo is in custody and unable to reestablish his life in the Dominican Republic, the longer his family will suffer the anxiety and uncertainty of how their own lives may be reshaped by his deportation and exclusion.

SARAFA LAW LLC ─────────────────────────────

Honorable Denise L. Cote
January 23, 2009
Page 9

### Conclusion

Hector Melo is a low-level offender with no history of drug trafficking. His involvement in the instant offense, a single sale of crack cocaine, was very limited in scope, and he derived no financial gain from it. He nevertheless faces four to five in prison, a sentence five to ten times the length he would face had his friend sought powder cocaine instead of crack. He faces certain deportation to the Dominican Republic, creating family hardships that will be exacerbated by a lengthy period of incarceration.

Based on the combination of factors discussed herein, Mr. Melo respectfully requests that this Court impose a non-Guidelines sentence below the range of 46 to 57 months. In view of the nature and circumstances of the offense, the history and characteristics of the defendant, including his family circumstances, the sentences available and the applicable Guidelines range, such a sentence is appropriate, but not greater than necessary, to achieve the goals of sentencing.

Respectfully submitted,

Melinda Sarafa

Attachments

cc:   AUSA Todd Blanche
      Hector Melo